Ms. Powell, please proceed. Good morning. May it please the Court, Brittany Powell of Fox Rothschild on behalf of the appellant Beiju Walude, Hardware Products Company, the mandatory respondent in the 2016-2017 Administrative Review of the Anti-Dumping Duty Order on certain steel mills from the People's Republic of China. The threshold issue in this appeal is whether Commerce's application of facts available with an adverse inference with respect to Walude's sales produced by its unaffiliated producer Tianjin Lingyu was reasonable. Commerce conducted an on-site verification of both Walude and two of its unaffiliated suppliers. During the course of the verification of Tianjin Lingyu, Commerce discovered boxes on Lingyu's facility that were labeled made in Thailand. As a result of finding these boxes and inferring that there was evidence of a fraudulent evasion scheme, Commerce determined that Lingyu's data was no longer verifiable and that it significantly impeded the proceeding. It also found that Walude and Lingyu— Do I remember correctly that they found just partial adverse facts available? Is that right? Reasoning that adverse facts available would be too harsh. Yes, Your Honor. They found partial adverse facts available with respect to only the sales produced by Lingyu, not the other suppliers. Commerce also determined that Lingyu and Walude failed to cooperate to the best of their ability. At the outset, I wish to note that I was present at this verification, so I watched this discovery unfold in real time. During the plant tour, Lingyu provided Commerce with complete access to its factory. They did not prevent them from accessing the packaging portion— Are you disputing whether they were properly found to be involved, Lingyu, in a fraudulent trans-shipment scheme? Are you disputing that? The issue is— It's yes or no. Are you disputing the fact-finding by Commerce that Lingyu was involved in a fraudulent trans-shipment scheme? I think there is insufficient record evidence to establish that they were involved in a fraudulent trans-shipment scheme. Did you add that in your opening brief? Lingyu explained—We provided in our opening brief and explained Lingyu's explanation during verification that they were only the producer of the nails, that their unaffiliated exporting customers were the providers of the labels that they sent to the printer and affixed to the boxes. The head of the factory explained that neither he nor any of the employees spoke English, and so their role— I think the only thing in the record is that he didn't speak English, but okay, go on. The issue here—and I wish to note that there is a remedy under the law for allegations of evasion, for investigations of evasion, that's the Enforce and Protect Act, which provides all of the requisite procedures for finding whether evasion had occurred. Here Commerce's obligation and mandate is to calculate dumping margins as accurately as possible, and they made these findings about Lingyu significantly impeding the proceeding and its data being unverifiable without substantial record evidence. There was no finding that—there was no factual support for Commerce's finding that Lingyu impeded the proceeding. In fact, they had full access to the facility. Once this discovery was found, Commerce requested it and was permitted to take as many pictures as it wished, and then further subsequently evaluated additional documents in Lingyu's records. There was no evidence or citation in the verification report or elsewhere that Lingyu somehow hindered, delayed, or prevented Commerce from conducting its proceeding. And so the record does not support a finding of a significant impediment of the proceeding. Second, there's insufficient record evidence—well, rather, Commerce's determination that Lingyu's information could not be verified is not supported by substantial evidence. This discovery happened in the course of the verification where Commerce had reconciled Lingyu's cost of production with its general ledgers. It reconciled all of its data and found no significant discrepancies, except for the finding of these boxes labeled Made in Thailand. It called into question the veracity of the information, which it had previously reconciled with other information provided in Lingyu's books and records. They were able to trace the inputs from purchase orders to the raw material subledger, and other instances where they were able to reconcile the information provided during the course of the administrative review. Here there's no rational nexus between discovering boxes mislabeled Made in Thailand with Lingyu's I'm sorry, you said boxes mislabeled Made in Thailand. Is that a fact-finding that I'm missing in this case? Is there a fact-finding by Commerce that the boxes were mislabeled, that those nails were actually made in China, but the boxes were mislabeled? When I say mislabeled, Commerce didn't make a fact-finding because they didn't investigate this issue. There was no evasion investigation. I should clarify that the boxes were labeled Made in Thailand. In essence, Commerce is punishing Hualude for this purported evasion in which it had no role, and there was no impact on the data that was used to calculate Lingyu's factors of production. We noted in our briefs the timing that these, the finding, the verification occurred in the administrative review in which the data was collected. And Commerce did say that, and I understand if I remember correctly, Commerce said something like there was evidence, including, you know, lots of dust and different things on the boxes that would suggest that this was not something that was new, but rather that it was old. And they did take that argument into account, is that right? They did make that statement. The photos are on the record. When you look at the photos, there's no evidence of cobwebs on the boxes. I understand. I'm not a fact-finder, though, right? And so, to me, I was more interested in your thoughts on Mueller, for example, and whether that would make it so adverse fact available would be applicable to this exporter. I think Mueller is distinguishable in the sense that in Mueller, there was an exporter who did not cooperate by providing product-specific factors of production data. That's not the case here. Lingu provided that information. So Commerce has a policy of applying facts available to induce parties to participate and cooperate. There's no position here that applying AFA would further induce Lingu to cooperate. They did cooperate. While Lude cooperated, they provided documents and responses to all of their information requests. Do you want to save any rebuttal time at all, Ms. Todd? Yes, Your Honor. Mr. Brophy? Mr. Brophy? Thank you. Police to court. Our issue is regarding the separate rate, or as the department likes to call it, the sample rate assigned to cooperative respondents that were not selected for an individual to conduct an examination. Now, Commerce takes the position that because this is an administrative review, and because they use sampling and selecting the mandatory respondents, that they can include an AFA rate in the average assigned to the cooperative separate rate companies, despite the fact that there were above de minimis rates available for Commerce to use in the calculation. And to clarify, there were three companies. One received an above de minimis rate based on no facts available. Lude received an above de minimis rate based on partial facts available, and the third respondent received a rate based on total adverse facts available. And we are challenging the use of that third rate in the average. Now, based on two points, one that Commerce has not supported this decision by substantial evidence, and also that it's contrary to the statute. Now, the Commerce's only justification... Why don't you start on why it's contrary to the statute? Because the statute certainly has an exception for de minimis, zero, and AFA rates, but that is only in the context of investigations, not administrative reviews. So what statute is it you're believing is correctly contrary to? I think our point is that while that portion of the statute does introduce itself as applicable to investigations, the court in Albemarle made a decision, stated that it was not just based on Commerce's discretion, that the statutory framework mandated that it also be applicable to administrative reviews based on... Where did they say that? I want you to direct me to your best language in Albemarle, which you think held that that statute, which on its face clearly only applies to investigations, is required by law to be applied to administrative reviews. Albemarle at 1352 to 53 states that the statutory framework contemplates that Commerce will employ the same methods for calculating a separate and periodic administrative reviews as it does in initial investigations. I'm sorry, I'm just struggling with where you are reading from. Oh, maybe I... Let me double check my page. I'm right at the point where 52 and 53 overlap, so what... 1352 starts with it is true, as the government points out, that 19 U.S.C. 67... So it starts out by saying it's true that the statute on its face only applies to investigations, but the framework contemplates Commerce will employ the same methods for calculating a And then it goes on to say, indeed, for this reason, Commerce itself has basically employed the same methodology in administrative reviews. So what we held in that case is Commerce was choosing to use the same methodology, and we found that to be consistent with the statute. Well, I think under our interpretation, I think we're saying what we understood the The statute was right as a whole when you consider that the statute when it's talked about administrative reviews indicates, uses a similar language, that Commerce is to determine the dumping margin and calculate the amount of anti-dumping duty, as well as the court's statement in footnote 7, that the text of the SAA is contrary to the Department's position saying that the text of the SAA starts with, for all conditions... Let me just tell you my take on this. My take on this is the statute is absolutely silent as to whether to apply a similar exception for the minimum zero and AFA rate to administrative reviews. The statute speaks to investigations. There's good and sound logic in saying, why limit it to investigations? Why not include administrative reviews? And in fact, it looks like Commerce has, in often cases, said it will apply that same concept to administrative reviews. But in this case, we have an actual Federal Register publication by Commerce where it made the decision to do something different with regard to sampling methodology. It articulated quite sound, rational, clear bases for why they were doing that, including the fact that there was a lot of gamesmanship going on in this process where people were having themselves excluded for the purpose of thereby driving the rates down. And so Congress thought that sampling methodology, it made a factual, rational, empirically based determination that in the sampling methodology, they should in fact include AFA rates. It feels like a really different situation than Albemarle. Albemarle was a case where Commerce was actually choosing to apply it in both circumstances. In our case, Congress, pre-litigation, came out with this sampling methodology publication in the Federal Register, which seems very sound, reasonable, thoughtful, well-founded. So I mean, the government could probably quote that later somewhere. But it certainly seems thorough and different. Why is that not entitled to Chevron deference? I think even if the court decides that Chevron deference is justified in this case, the decision still has to be supported by substantial evidence. So you've now pivoted. That was my other point. We're not challenging the methodology that Commerce used to select the mandatory respondents. We are challenging how they calculated a separate rate. And in that case, they have not provided an adequate explanation as to why inclusion of the AFA rate in the separate rate is necessary. I'm sure I understand you correctly. It doesn't matter what the sampling methodology is. They were not allowed in light of that decision on sampling methodology. They still couldn't apply the AFA rate. Right. And in that decision on the sampling methodology, I mean, in the Federal Register notice they promulgated, they explained how they were going to do sampling, how they were going to select the mandatory respondents. With respect to this calculation of the separate rate, they said they would deal with it on a case-by-case basis. So there was some notice there. There was some notice there. And we have challenged whether their use of it is based on substantial evidence. In this case, they say it's necessary to maintain the statistical validity of the sample, but they don't provide any citations, any statistical literature, or any statistical principles that makes that true. So, counsel, what is your theory as to how this case should have proceeded, starting with the investigation? I think starting with the investigation, I don't think they had a choice. The statute says they can't include an AFA rate in the separate rate, regardless of whether they use sampling or whether they use the largest exporters as the mandatories. When it gets to the review process, I think when they start and they get an AFA rate like they did in this case, then they have to explain why this case is different from all the other cases where they can't do it. They can't do it in investigations, even if they use sampling. The court has held they can't do it in administrative reviews where they choose the largest exporter. The court has held even when that statutory provision does not apply, even when commerce goes to the other reasonable methods section of the statute, that in almost all cases this court has held it's not allowed. But in this case, didn't they, in that sampling methodology public notice, didn't they explain exactly why, which is this repeated pattern of failure to participate and comply? Yeah, I think as this court... And wouldn't the sample in this case actually fully justify and support that rationale? Because they sampled three people and two of them ended up with partial or complete AFA rates. That is sort of justifying on its face exactly what commerce was concerned about, isn't it? I think this court in Shengzhen, Wuzhen, and I agree it's a different fact pattern, but the court said that deterrence is not the issue here. The issue is fairness and accuracy over deterrence. And I don't know what I'm being deterred from doing. My client cooperated, but they're still getting a rate that's partially based on adverse facts available. We wouldn't have... What are we deterred... Well, what if there had been a zero or a de minimis in the sample? You would have lethally pulled them in and been happy, right? You would have been like, yay, one of the three is de minimis, there's zero. Way to go. That's why we sued those. Well, again, that gets us to the other cases cited by this court where we got the reasonable method part section of the statute, and the court has said you should rely on the expected method and use the zero. Just to be clear, is your position that likewise commerce should be excluding zeros and de minimis? I want to know that you're consistent in your internal position. I don't think I would say that. I don't think it has to be consistent. Then you need to sit down, because your time is up, and that is a hypocritical statement. Thank you, Your Honor. So what do you think, Ms. Bay? Is he right? You have to exclude the AFAs, but you've got to include the de minimis and the zeros? How does that make any darn sense? It may please the court. It doesn't. You would have to include AFA, de minimis, and zero rates, and I don't think that there is any indication that commerce would not have included zero or de minimis rates had that been part of the sample. And as Your Honor noted, I don't think we would be here today if they had included zero and de minimis rates. As Your Honor noted, and as the trial court noted, Congress clearly left commerce with a discretion of how to handle AFA rates when calculating the non-examined rate in administrative reviews. Therefore, Chevron Step 1 does not apply, and we have to proceed to Chevron Step 2. And the only question then is whether commerce reasonably exercised its significant gap-filling discretion, and it clearly did so here. As this court has held before, commerce's methodology is accorded substantial deference, and as Your Honor noted, and I won't quote directly, but commerce did explain in its sampling methodology why it uses a sampling methodology, and that's when there is evidence to show that the largest respondents are not representative of overall dumping behavior. And therefore, in order to more properly reflect that, it does not apply to zero and sample or de minimis rates when calculating the sample rate for non-examined respondents. And I think that what's interesting here, and you posited the question about zero and de minimis rates, would also apply in a different context where there could be a proceeding where there's been a series of reviews where there's been a consistent zero or de minimis rate, but also a calculated rate, and that zero or de minimis rate wasn't there. So in that case, one of the respondents could have requested sampling based on that, and in that case, commerce would have also included zero or de minimis, and that would have been more reflective of the overall dumping behavior. I'm just going to hit really quickly on one particular issue, which is appellant's contention that fairness and accuracy are to be commerce's goals in calculating the non-examined respondent's rate. But here, including the AFA rate specifically leads to a higher level of accuracy. As commerce noted in its respondent selection memo, where it explained its use of the sampling, at least half of the respondents... Well, it leads to a higher level of accuracy potentially across the board, but perhaps not with regard to his individual client, right? And that's why he's here. Your Honor, I... It could potentially not be accurate of any given respondent, but I think the court said in Albemarle that what commerce is trying to do with the non-examined respondent's rate is make a reasonable approximation of the... But doesn't the argument that it's not fair with regard to my client go to the whole concept that commerce should just be forbidden from averaging? Because any time you average, unless everyone is at exactly the same number, somebody's going to be above that number, someone's going to be below that number, some companies might benefit from it, some companies might not lose. It seems like more of a challenge that commerce is prohibited from averaging. Yes, Your Honor, but as the trial court stated in the Laiju case, that's what happens when you average, and it simply isn't possible for commerce to individually examine every single respondent. And I think here, appellants... What about every compliant respondent? What about every respondent who offers to be... provide their data and be compliant? How onerous would that be? Well, I think in this case, appellant did not... It submitted a separate rate application, as did, I think, 21 other companies, but it did not request voluntary respondent treatment. So it could have requested voluntary respondent treatment, and I can't... What would that implicate? I don't totally understand that part. If they had requested voluntary respondent treatment, what would that have changed? Asserting a separate rate certification basically means that they're asserting that they're independent from China and they shouldn't be subject to the China-wide overall rate. And I haven't dealt too much with voluntary respondent treatment, but requesting to be a voluntary respondent, I think it's requesting that Commerce individually examine it. And I can't speculate as to whether Commerce would have agreed or denied that request. I think it's done both in other proceedings. But I think it's telling that they didn't request a voluntary respondent treatment. They were willing to roll the dice on the average until they didn't like the average. That's our take on it, yes. And so... And I think in most of the proceedings, Stanley has often requested a voluntary respondent treatment, but in general, none of the others have. I can't say for sure whether anyone has. And I think one of the appellants who I think their counsel didn't argue today, but Zhan, is telling. Zhan is one of the respondents here that is complaining about the sample rate of 44.48%. However, when it was individually examined back in Administrative Review 5, it actually received a rate of 72.52%. So, if we're looking at historical records as any barometer, then Zhan actually would have benefited by the sample rate despite complaining that the sample rate was not fair and should not have included AFA. I... just wanted to talk very quickly then about the de jure issue. If I talk quickly, you may go even faster than you're already going. I'm going to object, because it's tough to keep up with you. I apologize, Your Honor. Perhaps don't do it even more quickly. I will attempt to slow down. I know that I have a tendency to speak quickly. So, I think first going to the issue of whether this evidence of Tianjin's fraudulent transshipment scheme could merit AFA with regard to Tianjin. I think this court's decision in the Papier Fabrique case, I'm not sure if I'm well, that where there's evidence of a fraudulent scheme, that this renders that respondent's information wholly unreliable and unusable. So in that case, finding evidence of fraud was enough to find that respondent uncooperative and justify the use of AFA. So that, I think, justifies Commerce's findings with regard to Tianjin. The other question then regards whether Commerce could properly attribute that information to partial AFA. I think it's telling that appellants consider this a punitive measure to Deju. However, Commerce specifically addressed that, and the trial court specifically addressed that, and found that here Commerce only assessed, as Judge Stoll noted, partial AFA to Deju and only for the information that was submitted by Tianjin. And I think that demonstrates that Commerce was not acting punitively, but rather was acting in accordance with the statute and in accordance with this court's case in attributing the AFA on Tianjin's part to Deju, but only for that part of the sales that had to do with Deju. Unless this court has other questions, I would cede the rest of my time to Mr. Gordon. Thank you, Ms. Bae. Thank you. Mr. Gordon, pleased to see you. Good morning. May it please the court. Thank you. I'd like to pick up where Ms. Bae left off, speaking about the Deju, Hualuda, and Lingyu issue. Just to confirm, as Judge Stoll had commented, that the only claim on the record was that the plant manager claimed not to speak English. And we pointed that out because that's been described differently in some of the briefing before the court. The other point on Lingyu that I'd like to emphasize is that Commerce's decision that it could not rely on their information submitted and granted, they had ostensibly complete reporting at verification when Commerce discovered the evidence that's on the record of this obvious transshipment scheme. Old boxes, new boxes, boxes marked with purchase orders, all marked made in Thailand. As we discussed in our brief, if you read the verification report, it's clear that the company was scrambling and trying to tell Commerce whatever it could to try to weasel its way out of the situation it found itself in. On that basis alone, Commerce could reasonably conclude that the company's information is not reliable when they're being told a number of different evolving things at verification when they've discovered this apparent transshipment scheme. And as counsel had claimed that the only appropriate course of action for Commerce was to maybe self-initiate an IPA proceeding, that's not the only option Commerce has. In fact, as Commerce stated in its issues and decision memorandum, it was referring the information over to and in time, it had to make a determination concerning the veracity, the reliability of the information in front of it. And it did so, in our opinion, reasonably and correctly. The only other area I'd like to touch on is shifting over to the sample rate calculation. There's been much attention paid to Albemarle. We support the position that Commerce is not required as a matter of the statute to apply the separate rate calculation methodology in administrative reviews. It chooses to do so as a matter of its discretion. I think it's important as the court examines this issue to sort of examine footnote 7 in Albemarle in a little bit more detail. That footnote appears to be central to the position advanced that the statute contemplates short it requires certainly contemplates that that methodology will be used in administrative reviews. If you look at that in fact, the comments the first part, it says the section of the SAA from which the quoted excerpt above was taken refers to the calculation of dumping margins for all producers and exporters of merchandise who are subject to an anti-dumping investigation or for whom an administrative review is requested. That's citing page 4200. In fact, that quoted language omits a phrase. The quoted language actually says under existing practice Congress attempts to calculate individual dumping margins for all producers and exporters of merchandise who are subject to an anti-dumping investigation or for whom a review is requested. This is in section D, sampling all others rated and voluntary respondents. The final sentence of that section says as negotiated, articles 6.10 and 9.4 of the anti-dumping agreement largely reflect existing U.S. law and practice. Nevertheless, certain statutory amendments are necessary to conform the statute to the amendment. So, I think it's maybe not as accurate as possible to lift a section which is referring to existing practice and claim that without recognizing that Congress then made changes. In the next paragraph, there's a reference to the SAA states that the provisions governing the determination of individual dumping margins when there are large numbers of exporters and producers apply to reviews as well as investigations. It's critical here to note that the references to article 11.4 of the anti-dumping agreement. Article 11.4 talks about sunset reviews which were introduced as part of that agreement. It is not a reference to periodic reviews. And then there's a quote which is saying the provisions of article 6 regarding evidence and procedure shall apply to any review carried out under this article. And it's referring to article 6.10. Article 6 only deals with investigations. It doesn't deal with periodic reviews. Article 6 refers to investigations 19 times and doesn't refer to reviews or a more general proceeding at all. So, I think that if you look at these different pieces, you realize that the position that the statute requires that is entirely consistent with the SAA and entirely consistent with the anti-dumping agreement. In fact, the anti-dumping agreement doesn't deal in very much detail at all with periodic reviews because different signatories have different approaches. We have a retrospective approach. Other countries have a prospective basis for collective reviews. Can you give me a rational reason why there should be a different process that applies in investigations as opposed to administrative reviews? You know, I've certainly thought about that and recognizing that there's no statement of congressional intent. My firm belief from years of practice is that it reflects a balance and also recognizes the difference I hate to use this word but the different ecosystem in which an investigation is conducted versus periodic reviews are conducted. An investigation is not setting assessment rates. It's the process by which the agency determines whether to implement trade remedy relief at all versus reviews where that relief has been introduced and then the parties are in the process of determining the actual amount of dumping or subsidization to set assessment rates and going forward to revise cash depository. No, I'm sorry. The rationale that I believe makes the most sense here is that Congress is trying to strike a balance. On the one hand, excluding zero and de minimis rates would arguably lean toward having higher rates in an investigation. It might lean more toward imposing relief because you're eliminating the effect of the zero rates. On the other hand, excluding rates based entirely on AFA has a tendency to avoid calculating margins that are quite high. I feel like maybe you're missing the question which the question is why would there be a different methodology for the initial investigation versus the yearly reviews and maybe it has to do with giving commerce flexibility maybe it has to do with gamesmanship. I'm sorry. I think you're right. I was missing it. My apologies. I think you put your finger on it. The agency has to have discretion to react to and respond to facts on the ground what's in front of it which is exactly what you see with the Federal Register notice and exactly what you see on the facts of this case. Years of apparent manipulation of the sample rate calculation methodology to artificially undermine the rates that were assigned to the separate companies. Having said that, it doesn't matter why there's a difference in the rates that commerce has to find to resort to sampling. The notice just says among other factors you have to have a difference between the rates assigned to the largest exporters and the rate assigned to the others. That has been clearly established on the record here and we think commerce's discretion allows it to take the calculation methodology that it did. In fact, if you were to start eliminating rates based on all AFA or even zeros within the context of sampling and  based on the different strata, you would undermine the whole idea of trying to get a representative margin in this context. Okay, thank you. Ms. Powell and Mr. Brophy exhausted all of their time. I'll restore one minute of rebuttal for each of them. May it please the Court. Thank you, Your Honor. First, there's nothing in the record that suggests that Ling Yu was scrambling to come up with an explanation. The questions were simply asked and answered. Second, the application of adverse inferences statute explicitly states that an interested party that adverse inferences can be applied when an interested party has failed to cooperate to the best of its ability and complying with a request for information. Commerce has made no finding whatsoever that Walude or Ling Yu failed to comply with a request for information. Therefore, it was unreasonable for Commerce to reach this decision and conclusion of non-cooperation without articulating a basis for it. And that concludes my presentation. Thank you. Mr. Brophy. Thank you. Just a couple of points. We've talked a little bit here about why Commerce can do something different in administrative reviews than it does in investigations, but that is something Commerce needs to explain in its decision, which is not something they did here. They also need to explain why they can do something different in the case of sampling than they do when they use the largest respondents as mandatories. And they haven't done that sufficiently here. So at the very least, this should be remanded for further explanation. With regard to my other including zero rates, I want to just clarify that my answer is based on this Court's and the Commission's cases where Commerce only had zero rates and AFA rates. And in those cases, the Courts have held that they can include the zero rates but they shouldn't include the AFA rates. So I do think there's a difference. Thank you. Thank you. I thank all four counsel. This case is taken under submission.